LONDON, et al. *v.* BRAXTON, et al.

No. 40777 May 19, 1953 102 So. 2d 683

*Owen T. Roberts,* Brookhaven, for appellants.

*Noble & Noble, Hugh V. Wall,* Brookhaven, for appellees and cross-appellants.

APPELLANTS AND CROSS-APPELLEES IN RE-
PLY.

Hall, J.

Kemp Braxton, Sr., died intestate in the year 1924 owning approximately 280 acres of land and leaving as his sole and only heirs at law his widow, Agnes Braxton, and six children. An effort was made between the parties to partite the land by agreement, which failed, and this resulted in a partition suit in 1925. In this suit, Agnes waived her claim to a full 160 acres homestead right and agreed to a homestead of 80 acres, described as the N½ of the SE¼ of Section 2, Township 5, Range 6 E., and she retained an undivided one-seventh interest in the remainder of the land, the fee simple title to which remainder was divided among the heirs.

In 1931, Agnes executed a deed to the Trustees of the Mt. Zion School covering two acres in the southeast corner of the 80 acres set apart to her as a homestead. Of course, the effect of this conveyance was only to vest in the trustees the title to an undivided one-seventh interest therein which she owned in the said 80 acres, but the title to this two-acre tract has become vested in the trustees by virtue of adverse possession and it is not involved in this suit.

In 1935, the land in question was sold to the State for unpaid taxes for the year 1934, and on November 3, 1941, Edward Julius London obtained a forfeited tax land patent from the State for this land.

Between the time of the tax sale and the acquisition of title by London, Agnes Braxton had died. London's mother was one of her heirs, and the other parties mentioned in the pleadings are either heirs of the original Kemp Braxton or heirs or grantees of the other heirs still surviving.

This suit was brought by the surviving heirs against the London heirs, one of whom was Edward Julius London, and in this suit it was alleged that all the parties thereto were tenants in common and that the purchase by Edward Julius London was for the benefit of all the heirs and owners as tenants in common with him. The chancellor so found and held that the tenants in common were all entitled to their respective shares in the land in suit. ■■ ■ We think that his holding in this respect was eminently correct. In the case of Smith v. Smith, 211 Miss. 481, 502, 503, 52 So. 2d 1, we said:

"He was beyond question a cotenant after the death of his father and under the finding of the court he must have been a cotenant when he went into possession. However even if he had been a stranger when he entered into possssion, such possession does not continue as if by a stranger so as to make it hostile after he became a cotenant. Freeman on Cotenancy and Partition, Section 243, citing Carpentier v. Mendenhall, 28 Cal. 484, 487.

"It is further contended by appellants that since the tax sale occurred in 1930, prior to the time when he became a cotenant, his acquisition of the tax title in 1942 related back to the date of the tax sale and did not inure to the benefit of his cotenants. The only authorities cited to support this contention are some which are based solely upon the relationship of landlord and tenant and which hold that a tenant has the right to acquire an outstanding claim adverse to his landlord which existed prior to creation of the relation of landlord and tenant. The reason for that holding is quite evident; the tenant may have put valuable improvements on the property or may have laid out a large investment looking toward the production of a crop on the premises and if the landlord's title was not good he had a right to acquire the outstanding claim for his own protection. The relation of cotenants, however, is entirely different. They are in a position of trust and confidence toward each other and the rule is well established in this State and supported by the great weight of authority elsewhere that when one cotenant acquires an outstanding tax title it inures to the benefit of all the tenants in common. This means that the transaction is controlled by the time he acquired the tax title and not the time when the tax sale occurred." See also Griggs v. Griggs, 218 Miss. 433, 67 So. 2d 450.

It is true Edward Julius London was not a cotenant with the other parties to the suit at the time of the tax sale, but his mother had died and he had become a cotenant prior to his purchase from the State. So far as the record is concerned, he has never been in possession of the land, but was living in New Orleans at the time of the issuance of the tax patent, and later moved to Chicago, where he still resides.

In the original bill of complaint in this case, under the principle that "he who seeks equity, must do equity," the complainants offered to pay to the said Edward Julius London their respective portion of any sums ex-

pended by him in procuring the tax patent, and that offer has never been withdrawn in the pleadings. Several letters were introduced which were written by Edward Julius London to Kemp Braxton, Jr. As early as December 20, 1946, he said: ''Well, uncle, it is up to you about the place. Yes, that was your mother's place. I think it is more than right for you to get your share. All I want is the money I have paid out for taxes and the money it took from me to redeem the land and a child's part. I do not want to have anything to do with it because I have a home of my own up here. I only want these children to have a home. I hope they will appreciate little I have did for them. You know I keep the taxes up on it every year, then I have to pay my note on my home up here and also pay my taxes too.''

On February 13, 1947, Edward Julius London wrote another letter to Kemp Braxton, Jr., again expressing the desire to have only a reimbursement for what he had put in the land, and he said: ''For the rest I'll give it to those little children. Do you think that fair enough? Now listen if that is too much what I am asking for you make an offer yourself because I want to do the thing that is right. Friendship means more than anything in this world to me. . . . I know that is your mother and father's place. I want you to have it.''

On May 17, 1951, while this suit was pending, Edward Julius London again wrote to Kemp Braxton, Jr., acknowleging receipt of a letter and expressing surprise that his people were using his name to fight in court. He said that he had not received a letter from them that year and that they had not mentioned to him what they were doing about the matter.

On November 15, 1951, while this suit was pending, Edward Julius London wrote a letter to the attorneys for the complainants in which he said that he had not lived on or reaped any benefits from the place, but that he had his money in it. He said that he thought Kemp

Braxton, Jr., should have the land because it was his mother's place, and said that he did not want to have any hard feelings over the land, and regretted that he had bought it from the State because some of his people do think hard of him about it.

On January 16, 1952, Edward Julius London wrote to Kemp Braxton, Jr., and said that he was out more money than anyone on the place, and had not been given any credit for protecting it. He expressed the idea that he thought the best plan would be to sell all the timber on the land and divide the money between all the heirs and then divide the land by giving each one his equal part of it, but that they should pay him back the money that it took to redeem the land, plus the taxes and interest on the money. He also expressed the idea that if the matter is not settled to please each person there will be hard words and feelings among the heirs which he did not want any part of.

On March 15, 1956, Edward Julius London wrote another letter to Kemp Braxton, Jr., in which he said that he had not employed any lawyer in Mississippi, and he was blaming his father and brother about the suit, and said that they had not written him anything about it. He also stated that all he wanted out of it was his money with interest. He said: "I want to do the right thing about all. I do not want to take anything from anybody."

The chancellor did not allow a recovery of anything to Edward Julius London, and in this we think he was in error. It was his idea that the claim of London for reimbursement was barred by the statute of limitations, but we do not think so for the reason that the complainants offered to reimburse him in their bill of complaint, and that offer has never yet been withdrawn, and both prior to the filing of the suit and all during the pendency of the suit he was contending that he was entitled to be reimbursed. He did not appear at the trial of the suit,

and refused to give a deposition when it was sent to Chicago. According to the letters which he wrote he had refused to join in the defense of the suit, but after the chancellor refused to allow a reimbursement to him, he joined in the appeal bond. We are of the opinion that as to this feature of the case the decree should be reversed and the case sent back for a determination and adjudication of what Edward Julius London has spent to purchase the land from the State and in the payment of taxes on the land with interest at the legal rate of six percent.

While Edward Julius London was away, some of the London heirs entered upon the land in question about the year 1942 and tore down the house thereon and removed it to a tract of land owned by them and used the lumber for constructing another house thereon. Also some of the London heirs cut some timber from the land, as well as some paper wood, which they hauled away and sold. None of these matters were mentioned in the original bill of complaint or at any other time until the trial when this proof was developed, after which, at or near the conclusion of the case, the complainants, with leave of the court, amended the bill of complaint so as to seek a recovery for these items of waste or trespass. The chancellor held, and we think rightly so, that the claim for removal of the house and for the cutting of the timber and pulpwood was barred by the statute of limitations. Complaint on this point was raised by the appellees on cross-appeal.

In drawing the decree in this case it was erroneously recited that the land in question is situated in the N½ of the NE¼ of Section 2, Township 5 N, Range 6 E, when it should have said N½ of SE¼ of said section. The appellants raise this point and the appellees admitted it, so the same will be here changed so as to recite the correct description.

In the final decree appealed from, the costs of court were divided between the parties so as to assess the cost

of summoning witnesses and the witness fees for the witnesses of complainants should be taxed against them, and the cost of summoning witnesses and witness fees for the witnesses of the defendants should be taxed against them, and the remaining costs were taxed equally against the complainants and defendants. The chancellor had a right to make this division of costs under Section 1583, Recompiled Code of 1942, and in line with the chancellor's idea of a division of the costs, and in line with our holding here as to a division of the costs, the costs on appeal will be divided equally between the appellants and the appellees.

Direct appeal affirmed in part; corrected in part; and reversed and remanded in part; cross-appeal affirmed.

*McGehee, C. J.,* and *Kyle, Holmes* and *Gillespie, JJ.,* concur.